## THE HAZEL E. HERMAN.

District Court, S. D. Georgia. February 5, 1927.

1. **Customs duties** ⊚⇒129—Vessel seized within 48 hours after entering limits of customs district held not subject to penalty for not making entry or mailing manifest (Tariff Act 1922, §§ 435, 585 [Comp. St. §§ 5841e4, 5841h4]).

A schooner with a cargo of intoxicating liquors, which came within the limits of a customs district under stress, for the purpose of placing two of its crew in a hospital and without intention to unload cargo within such limits, and which was seized within 48 hours after its entry and before it had passed beyond such limits *held* not subject to penalty, under Tariff Act 1922, §§ 435, 585 (Comp. St. §§ 5841e4, 5841h4), for failing to make entry or to mail its manifest.

2. **Customs duties** ⊚⇒130(4)—Transfer of cargo on high seas to small boats, knowing that it would be smuggled ashore, held not to render schooner subject to forfeiture (Tariff Act 1922, §§ 447, 448, 453, 585 [Comp. St. §§ 5841e16, 5841e17, 5841e22, 5841h4]).

Transfer of cargo on the high seas from a schooner to small boats, knowing that it would be taken ashore, when the small boats were not under common control of the master of the schooner and their masters and crews, *held* not to make a continuous voyage and render the schooner subject to forfeiture for landing the cargo at a place other than a port of entry without a permit under Tariff Act 1922, §§ 447, 448, 453, 585 (Comp. St. §§ 5841e16, 5841e17, 5841e22, 5841h4).

3. **Customs duties** ⊚⇒133(6)—In suit for forfeiture prima facie case must be made before burden of proof is cast on vessel (Tariff Act 1922, § 615 [Comp. St. § 5841h35]).

Before the burden of proof is cast on the vessel in a suit for forfeiture for violation of the customs laws, under Tariff Act 1922, § 615 (Comp. St. § 5841h35), probable cause must be shown for institution of the suit.

In Admiralty. Suit by the United States against the Schooner Hazel E. Herman. Libel dismissed.

Chas. L. Redding, U. S. Atty., of Savannah, Ga., for the United States.

Jacob Gazan, of Savannah, Ga., for defendant.

BARRETT, District Judge. The United States libeled the schooner Hazel E. Herman, alleging the following wrongs:

(a) That the schooner was running at night without lights, in violation of the navigation laws of all civilized nations. No penalty for this is alleged.

(b) That the schooner, a foreign vessel, failed within 48 hours after arriving in the limits of customs district No. 18 to make entry at the customs house, in violation of section 435 of the Tariff Act of 1922 (Comp. St. § 5841e4), for which there is a penalty of not more than $1,000 fine.

(c) That the master of said schooner, after arriving in said district, failed to mail to the Comptroller of the United States at Washington, in the District of Columbia, or to the Comptroller of Customs, a copy of the schooner's manifest, for which there is a penalty of fine of not more than $500.

(d) That said schooner did enter and unlade 300 cases of intoxicating liquors on the high seas off the coast of the state of Florida "by means of small boats or launches, under the common control of the master of said vessel and the masters and crews of said small boats or launches, which said unlading was done and effected by prearrangement between the master of said schooner and the masters and crews of said small boats or launches." This subjects the vessel to forfeiture under sections 447 and 453 of the Tariff Act of 1922 (Comp. St. §§ 5841e16, 5841e22).

(e) That such foreign vessel, being required to enter at a port of entry, "did unlade merchandise by means of small vessels communicating with the shore of the United States, which said small vessels were under the common control of the master of said schooner and of the respective masters of said small vessels or boats, after said vessel had arrived from a foreign port to libelant unknown, before making entry of such schooner and without obtaining a permit for such unlading. That such unlading was done and permitted by the master of said schooner, not from emergency or other cause, other than a desire to smuggle and clandestinely introduce into the United States intoxicating liquors. That more than 300 cases of intoxicating liquors of the total value of $750 were so unladed." This subjected the schooner to forfeiture under section 448 of the Tariff Act of 1922 (Comp. St. § 5841e17).

(f) That said schooner, being anchored on the high seas, the master and supercargo

left said schooner and visited St. Augustine and Jacksonville, in the state of Florida, and arranged to sell and deliver 300 cases of intoxicating liquors, said delivery being made by the launches and small boats as stated in the two foregoing paragraphs. "That in the manner aforesaid said schooner arrived within the limits of collection district No. 18, and did thereafter attempt to depart therefrom, not from stress of weather or other necessity, without making a report of entry under the provisions of the Tariff Act of 1922." This subjected the vessel to a fine and forfeiture under section 585 of said act (section 5841h4).

The material facts established by stipulation or by evidence satisfactory to the court are in brief as follows:

Rafuse, acting for his wife, was the owner of the Herman, and of the schooner Pauline B. Mosher, and had been for some time and was engaged in rum running. Satinover was also engaged in rum running. An agreement was made between Satinover and Rafuse, while both were in Jacksonville, Fla., that the former would purchase the cargo of liquor on board the Herman, to be delivered at some point on the high seas near St. Augustine, Fla. Satinover owned 600 cases of liquor, which was shipped from Havana on the Pauline B. Mosher, and loaded therefrom to the Herman while on the high seas opposite St. Augustine. Satinover sent a boat or boats from Florida to the Herman while on the high seas, in pursuance of said agreement, and received therefrom certain liquors. Whether this liquor was a part of the original cargo bargained for, or part of Satinover's liquor loaded from Mosher, is not positively proven, though the opinion is expressed by Rafuse that it was a part of the liquor unloaded from the Mosher. Two hundred cases of alcohol, part of the original cargo, were delivered to a small boat, which came from and returned to Florida; but it is not shown that they were delivered to Satinover. Rafuse knew that the liquor and alcohol were to be smuggled into Florida.

While on the high seas the Hazel E. Herman was "hi-jacked," resulting in the serious wounding of the captain, and also the wounding of the cook. Rafuse was on board at the time. The remainder of the crew were negroes, none of whom could navigate the schooner out of sight of land. The "hi-jackers" being repulsed, the Herman made its way toward St. Augustine, whose harbor it could not enter by reason of insufficient water, and transferred the wounded men to a shrimp boat, to be carried to a hospital at St. Augustine, and thence sailed northward. Rafuse went ashore with the wounded men. About 10 o'clock that night, when 3½ miles from shore, the schooner Herman, running without lights, was captured by a United States Coast Guard cutter and taken to the port of Savannah, where libel proceedings were instituted.

The court was convinced that no credulity could be given to any statement by Rafuse, but nevertheless the facts confirm the belief that the Herman came within the 12-mile limit solely by reason of the wounding of the captain and the cook, in order to give them proper attention at a hospital; that the running without lights was owing to the apprehension that the "high-jackers" might again attack, and with the intention to make the port of Jacksonville to await the employment of a capable navigator, and not for the purpose of undertaking to smuggle the liquor in while within the 12-mile limit. There is no urge that in this case the treaty with Great Britain of May 22, 1924, has any effect. There is no satisfying evidence that the small boats and launches were under the "common control" of the master and owner of the schooner and of the masters and crews of the small boats, though it is satisfactorily proven that, at least in the case of Satinover, the small boat was sent to the Herman at sea by virtue of the previous arrangement made by him in Florida with the owner of the Herman and of the cargo.

1. There is no allegation that the vessel or owner is subject to forfeiture or fine by reason of navigating at night without lights. [1] 2. It is my opinion that this vessel came within the customs limit under stress, and that while in such limit, including the time of its capture, it was not planning to unlade its cargo within such customs limit. Even if this were not true, the capture of the vessel and its retention by the United States authorities would make inapplicable the requirement to make entry at the customs house or to mail a copy of its manifest after capture, when it had not been within the customs limit for as much as 48 hours before its capture. This requires a finding adverse to the government under the alleged violations set forth in (b) and (c), and also in (f), unless "common control"—discussed in the next paragraph—has been established and has the effect urged by the government.

[2] 3. Charges (d), (e), and (f) are founded upon the theory that the transshipment from the Herman on the high seas to small boats and launches, which carried the liq-

nor to the United States and were under the "common control" of the master of the Herman and the masters and crews of the small boats, formed a continuous voyage and made the Herman equally guilty as if it had entered the 12-mile limit and there unloaded.

As to the small boat used by Satinover, the negation of the "common control" comes from his lips, and he was the government's principal witness. There was no evidence as to the other shipment in a small boat authorizing any conclusion as to the presence or absence of a "common control." It must be borne in mind that forfeiture proceeding or the imposition of penalties is in the nature of a criminal prosecution, and neither forfeiture nor penalty can be imposed without proof. Suspicion, however acute, is not sufficient.

[3] It is urged by the district attorney that, under section 615 of the Tariff Act of 1922 (Comp. St. § 5841h35), after the seizure of the vessel the burden of proof is upon the claimant to establish the innocence thereof, relying upon The Squanto, 13 F.(2d) (C. C. A. Second Cir.) 548, 551. Section 615 reads as follows:

" * * * In all suits or actions brought for the forfeiture of any vessel, vehicle, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant; and in all suits or actions brought for the recovery of the value of any vessel, vehicle, merchandise, or baggage seized for violation of any such law, the burden of proof shall be upon the defendant: Provided, that probable cause shall be first shown for the institution of such suit or action, to be judged of by the court."

Such interpretation does not give the proper effect to the proviso. Headnote 5 in The Squanto justifies this urge by the district attorney, being as follows: "Under Tariff Act 1922, § 615 (Comp. St. Ann. Supp. 1923, § 5841h35), burden is on claimant to establish innocence of vessel charged with unlawful unlading of merchandise."

It seems clear that the interpretation in this headnote is too restricted, for it is manifest from the opinion that the evidence established probable cause for instituting the proceeding, and it was only after such probable cause had been established that the burden was transferred to the claimant. The essential is that the government must first establish probable cause. If this statute were subject to the interpretation sought by the government I would unhesitatingly agree with the conclusion of Judge Thomas, in The J. Duffy (D. C.) 14 F.(2d) 426, 429, that such statute would be unconstitutional.

While it was not charged in the libel, stress was laid in the proof upon the fact that the bargaining for the acquisition of the liquor in question was made in the United States. If this were a conspiracy charge, such urge would be entitled to great consideration; but I cannot see the force of it in the effort to subject this vessel to this libel.

By reason of the foregoing facts, with the result that the libel is to be dismissed, I do not conceive it appropriate to discuss here the important and interesting questions as to whether the tariff laws extend beyond the 12-mile limit or the treaty limits; whether a vessel on the high seas can be forfeited under the laws of this country because of the knowledge of the master of the vessel that the goods transshipped on the high seas were to be smuggled into the United States; or whether a "common control" by the master of the large vessel and the master or crew of the small vessel, smuggling the merchandise into the United States, would subject the large vessel to condemnation in the United States, into whose customs waters it never came, except under such circumstances as would excuse it from liability for so coming. By this statement I do not mean to imply any conclusion on my part, but merely to declare that the decision of such questions is not now demanded, or in my opinion appropriate.

An appropriate decree will be signed, dismissing the libel.